

**FILED**
**Jun 24, 2020**
**08:34 AM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT JACKSON

| | |
|---|---|
| **TERRY JOHNSON,** | )    **Docket No. 2017-07-0640** |
|      **Employee,** | ) |
| **v.** | ) |
| **PAPA JOHN'S a/k/a PATRIOT** | )    **State File No. 46304-2016** |
| **PIZZA, LLC,** | ) |
|      **Employer,** | ) |
| **And** | )    **Judge Allen Phillips** |
| **STATE FARM FIRE & CAS. CO.,** | ) |
|      **Carrier,** | ) |
| | ) |

## COMPENSATION HEARING ORDER

This case came before the Court on May 27, 2020, for a Compensation Hearing. The issues were the extent of Mr. Johnson's permanent disability, whether the benefits should be commuted to a lump sum, and payment of attorney's fees and costs. For the following reasons, the Court holds that Mr. Johnson is permanently and totally disabled. It addresses the remaining issues below.

### History of Claim

*Mr. Johnson's injury and treatment*

On May 14, 2016, Mr. Johnson was involved in a motor vehicle accident while delivering pizzas for Papa John's. He required air transport to Vanderbilt Medical Center.

At Vanderbilt, Mr. Johnson was diagnosed with multiple injuries, including:

- Diffuse axonal injury to the brain;
- Frontal subdural hematoma;
- Subarachnoid hemorrhage;
- Facial and scalp lacerations;
- Right cranial nerve injury affecting the right eye;

1

- Bilateral femur fractures; and
- Fractures of the left wrist and small finger.

Mr. Johnson was treated by many providers at Vanderbilt, including orthopedic trauma surgeon Dr. Manish Sethi. On May 17, Dr. Sethi surgically repaired the femur fractures, and at the same time other surgeons attended to Mr. Johnson's left-wrist and finger fractures. Dr. Sethi testified in his deposition that Mr. Johnson's condition was so grave when he first saw him that he "frankly, did not expect him to survive." He described Mr. Johnson's right femur as "completely destroyed," and his left femur as "almost completely destroyed."

After the initial surgery, Mr. Johnson remained hospitalized at Vanderbilt through June 24. Plastic surgeons repaired the facial and scalp lacerations, ophthalmologists were consulted for the right-eye injury, and neurosurgeons placed a drain to relieve pressure from his brain. A serious complication arose when he developed a bowel blockage and required removal of a large portion of his colon with placement of a colostomy bag. He then developed blood clots in his lungs.

After treatment for those conditions, Mr. Johnson was admitted to Stallworth Rehabilitation Center and underwent therapy for his leg and traumatic brain injuries. He was discharged home on July 27 with an order for 24-hour supervised care. Papa John's then began paying Mr. Johnson's wife approximately $3,500 per month to serve as his caregiver, an arrangement that continued as of the hearing.

Once home, Mr. Johnson continued medical treatment and evaluation over the next two years.[1] On October 30, 2016, Dr. Jeffrey Uzzle performed a Social Security disability evaluation. He recorded the history of Mr. Johnson's multiple injuries but noted "his fiancée completed his paperwork for him." Dr Uzzle found Mr. Johnson's right eye was closed and that his visual acuity was only 20/200 when it was opened for testing. He said Mr. Johnson had a driver's license but could not drive because of the brain injury. Dr Uzzle observed him walking with a "slow, but functional gait pattern" and that he had poor balance. He described Mr. Johnson as "anxious" but cooperative.

Regarding restrictions, Dr. Uzzle believed Mr. Johnson could "occasionally" lift or carry up to twenty pounds but could only lift or carry ten pounds "frequently." He said he could walk for up to thirty minutes at a time and for up to four hours per day but added he needed a cane to do so. Dr. Uzzle said Mr. Johnson should never climb ladders, work at heights, move mechanical parts, or operate a motor vehicle.

---

[1] The Court summarizes the medical treatment as pertinent based on review of the stipulated medical records consisting of several hundred pages.

In January 2018, Dr. Ken Berry completed a Social Security disability evaluation in which he stated that Mr. Johnson could lift ten pounds only occasionally but never carry any weight. He said he could never climb, balance, stoop, kneel, crouch, or crawl. Dr. Berry said Mr. Johnson could not use either hand to push, pull or reach, and that he could not drive. Due to his eye injury, which Dr. Berry described as a "blind" right eye, Mr. Johnson could not avoid hazards in the workplace, read small print or a newspaper, or view a computer screen. He said Mr. Johnson could not perform activities such as shopping, and that he should not travel without a companion for assistance.

In February 2018, Mr. Johnson saw Dr. Mark Phillips, a clinical neuropsychologist, for evaluation of the traumatic brain injury. Dr. Phillips found Mr. Johnson suffered from memory deficits and poor insight, and that he was dependent upon his caregiver. His poor memory manifested with trouble recalling names and events before the accident. His caregiver prepared his meals, as he no longer cooked, and she did all driving. Dr. Phillips determined Mr. Johnson could not manage his own finances. From the physical standpoint, Dr. Phillips noted Mr. Johnson's reports that he required assistance when entering and exiting the bathtub and putting on socks, and that he limited his eating due to urgency and incontinence.

Dr. Phillips conducted neurological and psychological testing that revealed a "Major Neurocognitive Disorder" due to the traumatic brain injury. This disorder manifested not only in Mr. Johnson's memory deficits but also in a poor attention span, problems with language, impaired visual-motor function, and decreased reasoning. Because of his condition, Dr. Phillips said Mr. Johnson needed twenty-four-hour in-home care.

*Expert proof*

Dr. Sethi last saw Mr. Johnson in August 2018. He noted Mr. Johnson was "limping quite extensively" and repeated, "I was just amazed the guy's alive." He called Mr. Johnson's impairment from his leg injuries "pretty devastating," akin to "someone with a brain injury and this guy already had a brain injury." Due to the leg injuries, Dr. Sethi said Mr. Johnson should limit his walking and restrict his lifting to fewer than five pounds.

Dr. Sethi provided a twenty-percent impairment rating for the leg injuries but added he might have "underestimated it." He also said the total impairment from all injuries "would be much higher." As to returning to work, Dr. Sethi told Mr. Johnson he did not think he could return to a "normal job." He added, "frankly, if the guy can live any semblance of a normal life, I think it's good."

Dr. Samuel Chung testified by deposition. He is a physical medicine specialist and certified independent medical examiner who saw Mr. Johnson at the request of his attorney. Dr. Chung took a detailed history, reviewed the extensive medical records, and evaluated Mr. Johnson for all injuries other than the legs. He noted that Mr. Johnson almost fell in

the examination room. He assessed a total impairment rating of fifty-two percent to the body based on the following impairments under the *American Medical Association Guidelines to the Evaluation of Permanent Impairment, 6th Edition*:

- Twenty percent impairment for the traumatic brain injury due to altered mental status, and cognition of a moderate degree, and the impact of these on Mr. Johnson's activities of daily living based on Dr. Phillips's testing;
- Fifteen percent for the ileostomy with residual effects;
- Twenty-five percent for the facial disfigurement because of the right eye injury based on distortion of the normal facial anatomy causing significant disruption of social activity; and
- Six percent because of lost range of motion of the left wrist and left fourth finger.

When Dr. Chung combined his fifty-two-percent rating with Dr. Sethi's twenty-percent rating for the legs, he said Mr. Johnson has a total impairment of sixty-two percent to the body as a whole.

Dr. Chung testified Mr. Johnson could not carry any weight and could lift only ten pounds frequently and only occasionally with the left arm. Dr. Chung said Mr. Johnson would be unable to be on his feet and lift items because he needed a cane to ambulate. He perceived Mr. Johnson to be a danger to others in a work setting due to his brain injury, noting that he could only focus for "less than two to three minutes." Like Drs. Uzzle and Berry, Dr. Chung said Mr. Johnson could not drive or work around moving mechanical parts. He said Mr. Johnson's poor insight caused him to "not always be aware of what his deficits are."

Dr. Robert Kennon, a licensed psychologist and vocational expert, testified at trial on behalf of Mr. Johnson. Dr. Kennon interviewed Mr. Johnson and performed a battery of testing to evaluate his mental, psychological and vocational functioning. When he performed his evaluation, he was concerned that Mr. Johnson might fall in his office because of his difficulties walking.

Dr. Kennon's mental and psychological testing revealed that Mr. Johnson functioned with "borderline intellectual ability," with an IQ of only seventy-five, which placed him in the fifth percentile. He has a seventh-grade sentence comprehension ability, a fourth-grade spelling equivalency, and third grade-level math skills. The mathematical limitations were so severe that Dr. Kennon said Mr. Johnson is incapable of managing his own finances. Further, Dr. Kennon said Mr. Johnson's cognitive and academic capacities would prevent him from completing vocational rehabilitation, even if his physical abilities would allow it. He noted his findings were consistent with those of Dr. Phillips. Also, like Dr. Chung, Dr. Kennon believed Mr. Johnson does not fully grasp the extent of his injuries.

4

When considering the testimony of Dr. Berry and Dr. Chung, Dr. Kennon said Mr. Johnson had no transferable job skills in the open labor market and was 100 percent disabled. Under the restrictions placed by Dr. Sethi, Dr. Kennon found a 99.74% loss of moderately transferable skills (based on Mr. Johnson's prior work experience), and when considering Dr. Uzzle's restrictions, he found an 85.97% loss of moderately transferable skills. He found only fifteen possible jobs in a labor market survey based on Dr. Uzzle's restrictions but noted Mr. Johnson's condition, age, and the current unemployment situation would challenge him further. However, even if he could find a job he might perform physically, Dr. Kennon questioned whether Mr. Johnson's cognitive function would allow him to work because of his decreased memory, lack of insight and attention to detail, and inability to sequence tasks.

*Lay testimony*

Mr. Johnson testified he had no memory of the accident and only limited memory of his life before it. He remembers waking up at the Stallworth Center, where he said he stayed to "help me get my legs moving." He can remember completing high school and working in the restaurant industry. He does not think he could work now.

Mr. Johnson said he needs help walking and now uses a walker rather than a cane. He can stand "for a minute or two." He has trouble climbing steps and can neither kneel nor squat. He has pain in his legs up to his hips and cannot open his right eye. He lifts nothing because of the abdominal injury, and he cannot flex his left hand.

Mr. Johnson described his fear of urgent bowel movements and said he uses the restroom at least six times per day. He monitors his eating and consumes smaller portions to avoid urgency. He spends his days at home and does no "chores" around the house. He scarcely leaves his home, but when he does, it is always with his wife, who drives them. He currently draws Social Security disability benefits.

Crystal Johnson testified she was living with Mr. Johnson at the time of the accident. They married in 2019. She said her husband was in a coma for two months and then Stallworth for another month, a time that she never left her husband's side, allowing her to observe his condition. She said Mr. Johnson has "gotten worse" over the last eighteen months and can "barely walk." He can stand for no more than ten minutes maximum and he does not fall "because I'm right there." She said she has to "help him up," and that "he goes everywhere with me." She described his lack of interest in leaving home because of his bowel urgency, and she noted he is quick to anger and has poor memory. She manages the family finances.

Mrs. Johnson quit her job to care for her husband, and the worker's compensation carrier pays her $3,456 every four weeks to do so. That payment, along with Mr. Johnson's approximately $600 per month Social Security check, is the family's income. She testified

5

their bills were "current," and that any lump-sum payment of benefits in this case would go to pay off their house.

Based on this evidence, Mr. Johnson claimed he was totally disabled; Papa John's argued he was not. It also argued there was no "special need" for lump-commutation, as the family income was approximately $50,000 per year with Social Security benefits and payments to Mrs. Johnson as his caregiver.

## Findings of Fact and Conclusions of Law

At a Compensation Hearing, Mr. Johnson must establish all elements of his case by a preponderance of the evidence. Tenn. Code Ann. § 50-6-239(c)(6) (2019).

### Extent of permanent disability

The extent of Mr. Johnson's disability is a question of fact determined by consideration of all the evidence, both expert proof and lay testimony. *Duignan* v. *Stowers Mach. Corp.*, No. E2018-01120-SC-R3-WC, 2019 Tenn. LEXIS 224, at *22 (Workers' Comp. Panel June 19, 2019). The relevant factors are Mr. Johnson's skills, training, education, age, local job opportunities, and ability to work at available jobs in his post-injury condition. *Id.* Although a vocational expert assessed these factors, Mr. Johnson's testimony concerning his ability to return to work is "competent testimony" that the Court should consider. *Hubble v. Dyer Nursing Home*, 188 S.W.3d 525, 536 (Tenn. 2006). He is entitled to an award of PTD benefits if his injury "totally incapacitates [him] from working at an occupation that brings [him] an income." Tenn. Code Ann. § 50-6-207(4)(B).

The Court turns first to the expert proof. Dr. Sethi restricted Mr. Johnson to lifting no more than five pounds. Dr. Berry restricted him to no more than ten. Dr. Uzzle was slightly more generous, but still said Mr. Johnson should never lift or carry more than twenty pounds and only ten pounds frequently. Dr. Sethi did not think Mr. Johnson could return to work.

When considering the restrictions of Dr. Sethi and Dr. Berry, Dr. Kennon testified Mr. Johnson has no transferable job skills. When considering Dr. Uzzle's restrictions, Dr. Kennon found only fifteen jobs in his labor market survey that Mr. Johnson might perform *physically*. However, Dr. Kennon doubted Mr. Johnson could do those because of his impaired mental functioning.

As to the lay evidence, the Court observed Mr. Johnson ambulate in and about the courtroom during a three-plus hour hearing. His gait was unsteady, unbalanced, and aided constantly by a walker. His wife was always close by to assist. His impaired movement appeared exactly as described by the physicians. Based on direct observation, the Court does not believe he could physically function in any work setting.

6

Likewise, the Court heard Mr. Johnson's slow and deliberate manner of speaking. When he was not speaking, the Court observed that Mr. Johnson sat quietly, unable to open his right eye and often closing his left. The scarring from his scalp and facial injuries was evident. He appeared detached from the proceedings, and like the physicians described, somewhat unaware of the extent of his disability. Nevertheless, both in his speech and by his demeanor, the Court finds him credible. He was calm, forthcoming, and honest, and considering his condition, very reasonable in explaining the effects of his injury. *See, Kelly v. Kelly*, 445 S.W.3d 685, 694-695 (Tenn. 2014) (discussing indicia of witness credibility).

Those effects were obvious from his testimony. He seldom leaves the house, and when he does, his wife accompanies him, always driving because he cannot. He described his problems walking and that he often needs help to do so. He cannot see with his right eye or lift anything. His days are spent at home, where he does very little. He has a very real fear of his frequent urgency to use the restroom.

Mr. Johnson's wife echoed the problems Mr. Johnson described. She cares for him constantly and manages their finances because he cannot. She says he does not fall only because she is "right there." She noted his quickness to anger, poor memory, and urgency to use the restroom. Further, the Court finds it particularly telling that the carrier pays her approximately $3,500 per month to care for her husband.

Considering both the medical and lay proof, the Court holds Mr. Johnson's injuries totally incapacitate him from working at an occupation that brings him an income and that he is permanently and totally disabled under Tennessee Code Annotated section 50-6-207(4)(B).

*Calculation of benefits*

Under section 207(4)(B), Mr. Johnson is entitled to payment of PTD benefits until he becomes eligible for full Old Age Social Security benefits. Papa John's did not contest that Mr. Johnson will become eligible for those benefits when he reaches age 67 on December 31, 2033. Thus, the Court looks to the date Papa John's last paid temporary disability,[2] December 9, 2018, as the starting date of Mr. Johnson's permanent disability. The time period from that date until December 31, 2033, is 785 weeks and six days. At the stipulated weekly compensation rate of $128.70, the benefits payable for the entire period of disability equal $101,139.84. The accrued benefits from December 9, 2018, through June 24, 2020, a period of 80 weeks and four days, shall be paid to Mr. Johnson in a lump sum of $10,369.36.

---

[2] Papa John's paid temporary disability benefits through December 9, 2018, beyond the date of his maximum medical improvement on August 13, 2018. Thus, the calculation of PTD benefits begins with December 9.

*Lump-sum commutation*

Mr. Johnson moved the Court to commute the remaining amount of his disability benefits to a lump sum. The Court cannot do so. Tennessee Code Annotated section 50-6-207(4)(A)(ii)(a) provides that PTD benefits "may be commuted to a lump sum to pay only the employee's attorney's fees and litigation expenses and to pay pre-injury obligations in arrears." Even then, the "commuted portion of an award shall not exceed the value of one hundred (100) weeks of the employee's benefits." *Id.* at (ii)(b).

Here, the Court finds it appropriate to commute 100 weeks of the award to pay Mr. Johnson's attorney's fees and litigation expenses. Tennessee Code Annotated section 50-6-229(a) allows commutation of attorney fees if "approved and ordered by the trial judge." Further, in *Spencer v. Towson Moving & Storage*, 922 S.W.2d 508, 511 (Tenn. 1996), the Tennessee Supreme Court noted that payment of attorney fees in a lump sum avoids costly administrative burdens and delays caused by periodic payments first going to the attorney for deduction of fees. It is in Mr. Johnson's best interest to prevent delay. Thus, the Court commutes 100 weeks of the award and orders Papa John's to pay it in a lump sum of $12,870 (100 weeks times $128.70).

*Attorney's fees*

As to the amount of the fee, Tennessee Code Annotated section 50-6-207(4)(a)(iii) provides that fees in PTD cases "shall be calculated upon the first four hundred and fifty (450) weeks of disability only." Further, under section 226(a)(1), any attorney fee shall not exceed twenty percent of the award.

Because a twenty-percent fee here would exceed $10,000, the Court asked employee's counsel to submit an affidavit supporting it. *See* Tenn. Code Ann. § 50-6-226(a)(2(C). In his affidavit, counsel stated that he has practiced law for forty-seven years, he expended extensive time and expense prosecuting the case, and he had a written agreement for fees and expenses.

The Court finds these assertions support a twenty-percent fee. Specifically, the Court considers the factors in Tennessee Supreme Court Rule 8, RPC 1.5. The relevant factors here are the results obtained, the amount of work required, the customary fee set forth in a written agreement, and counsel's experience and reputation.

Thus, of the 100-week commutation, counsel may take an attorney fee of $11,583 (450 weeks times twenty percent times $128.70). The remaining balance of the 100-week commutation might be used for payment of counsel's expenses.

Papa John's attorney's fees also exceeded $10,000, and the Court asked its counsel to submit an affidavit. Counsel set forth his thirty-three years of practice, his reputation

8

and ability, and the substantial time expended. For the same reasons as the employee's attorney, the Court finds employer's counsel's fees were appropriate and approves them.

## Recalculation of payments

Section 207(4)(ii)(c) requires that after the commuted lump sum is determined, the amount of the weekly PTD payments shall be recalculated to distribute them in equal weekly installments over the entire period of disability. Here, the remaining PTD benefits after commutation equal $77,990.48 ($101,139.84 less the accrued benefits of $10,369.36 and the 100-week commutation of $12,780).

However, the recalculation provided under section 207(4)(ii)(c) is proscribed in this case. Mr. Johnson's stipulated compensation rate is $128.70 per week, the minimum weekly benefit for his date of injury. If the Court recalculates the weekly payments to distribute them over the period of disability, then Mr. Johnson would receive weekly periodic payments in an amount less than the minimum weekly benefit. Because section 207(4)(B) provides that "in no event shall the compensation paid [for PTD] be less than the minimum weekly benefit," the Court holds that Papa John's shall pay the remaining balance of $77,990.48 in periodic payments of $128.70 per week until paid in full.

## Discretionary costs

Mr. Johnson moved for payment of his discretionary costs. Papa John's did not contest the motion. Thus, the Court orders Papa John's to pay Mr. Johnson's discretionary costs of $5,203.40 as itemized in Technical Record Exhibit 18.

## Medical expenses

Finally, Mr. Johnson claimed one medical bill was unpaid. Papa John's did not dispute it. The Court orders that Papa John's pay any outstanding past medical expenses and further orders it pay for Mr. Johnson's future medical expenses under Tennessee Code Annotated section 50-6-204(a)(1)(A). It shall designate the authorized physician.

9

**IT IS, THEREFORE, ORDERED** as follows:

1. Papa John's shall pay Mr. Johnson permanent total disability benefits of $101,139.84 for the period of December 9, 2018, through December 31, 2033. It shall pay the accrued benefits from December 9, 2018, through June 24, 2020, in a lump sum of $10,369.36 and pay 100 weeks of commuted benefits in a lump sum of $12,780 to pay for attorney's fees and expenses. The remaining $77,990.48 shall be paid periodically at the rate of $128.70 per week until fully paid.

2. Papa John's shall pay all reasonable and necessary past and future medical benefits under Tennessee Code Annotated section 50-6-204(a)(1)(a).

3. Papa John's shall pay Mr. Johnson's discretionary costs of $5,203.40.

4. The Court approves the fees of both attorneys.

5. The Court taxes the $150.00 filing fee to Papa John's to be paid to the Court Clerk under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (August, 2019) within five business days of this order becoming final, and for which execution might issue if necessary.

6. Papa John's shall file a Statistical Data Form (SD-2) with the Court Clerk within five business days of the date this order becomes final.

7. Absent an appeal, this order shall become final thirty days after entry.

**ENTERED June 24, 2020.**

_Allen Phillips_
**Judge Allen Phillips**
**Court of Workers' Compensation Claims**

10

## APPENDIX

Exhibits
1. Deposition of Dr. Manish Sethi
2. Deposition of Dr. Samuel Chung
3. Collective Medical records
4. Payment history of Medical Bills
5. Payment history of Temporary Disability Benefits
6. Copy of Mr. Johnson's Driver's License
7. Dr. Kennon's Report

Technical Record
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Scheduling Order
4. Order on Filing of Medical Records
5. Order Granting Summary Judgment to Subsequent Injury Fund
6. Motion to Extend Deadlines
7. Order Extending Deadlines
8. Motion for Discretionary Costs
9. Motion for Commutation of Attorney's Fees
10. Motion for Commutation of Award
11. Employee's Witness and Exhibit List
12. Post-discovery Dispute Certification Notice
13. Employee's Brief and Pre-Compensation Hearing Statement
14. Employer's Exhibit List
15. Employer's Witness List
16. Employer's Pre-Hearing Statement
17. Employee's Supplemental Motion for Discretionary Costs
18. Employee's Second Supplemental Motion for Discretionary Costs
19. Order of Continuance
20. Stipulation of medicals attached to Dr. Chung's deposition
21. Second Order of Continuance
22. Third Order of Continuance

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on June 24, 2020.

| Name | Via Email | Service sent to: |
|---|---|---|
| Charles L. Hicks, Attorney for Employee | X | larry_hickslaw@bellsouth.net<br>shearon_hickslaw@bellsouth.net |
| Robert O. Binkley, Jr., Attorney for Employer | X | rbinkley@raineykizer.com |

*Penny Shrum*

**Penny Shrum, Court Clerk**
wc.courtclerk@tn.gov

12



<u>Compensation Hearing Order Right to Appeal</u>:

If you disagree with this Compensation Hearing Order, you may appeal to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the compensation hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fullycompleted Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript and file it with the court clerk *within fifteen calendar days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the court clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. The appealing party has *fifteen calendar days* after the date of that notice to submit a brief to the Appeals Board. *See the Practices and Procedures of the Workers' Compensation Appeals Board.*

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Hearing Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry.** *See* **Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

Docket No.: _____

State File No.: _____

Date of Injury: _____

_____

**Employee**

v.

_____ **Employer**

Notice is given that _____ *[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date filestamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____ issued

by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone:_____

Email:_____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____

__ *[Signature of appellant or attorney for appellant]*

RDA 11082



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name:_____     2. Address: _____

3. Telephone Number: _____     4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

   My employer's address is: _____

   My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ | per month | beginning _____ |
| SSI | $ _____ | per month | beginning _____ |
| Retirement | $ _____ | per month | beginning _____ |
| Disability | $ _____ | per month | beginning _____ |
| Unemployment | $ _____ | per month | beginning _____ |
| Worker's Comp. | $ _____ | per month | beginning _____ |
| Other | $ _____ | per month | beginning _____ |

9. My expenses are:

Rent/House Payment $ _____ per month    Medical/Dental  $ _____ per month

    Groceries        $ _____ per month       Telephone      $ _____ per month

    Electricity        $ _____ per month       School Supplies $ _____ per month

    Water           $ _____ per month       Clothing        $ _____ per month

    Gas             $ _____ per month       Child Care     $ _____ per month

    Transportation $ _____ per month       Child Support  $ _____ per month

    Car             $_____ per month

    Other           $ _____ per month (describe: _____ )

10. Assets:

    Automobile             $ _____       (FMV) _____

    Checking/Savings Acct. $ _____

    House                   $ _____       (FMV) _____

    Other                   $ _____       Describe:_____

11. My debts are:

| Amount Owed | To Whom |
| --- | --- |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____
APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____
NOTARY PUBLIC

My Commission Expires:_____